# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-98V**
UNPUBLISHED

| | |
|---|---|
| BETH RUGE, | Chief Special Master Corcoran |
| Petitioner, | Filed: October 3, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Jeffrey S. Pop, Jeffrey S. Pop & Associates, Beverly Hills, CA, for Petitioner.*

*Catherine Elizabeth Stolar, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT[1]

On January 5, 2021, Beth Ruge filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a Table injury – shoulder injury related to vaccine administration ("SIRVA") - as the result of an influenza ("flu") vaccine received on October 28, 2019. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons set forth below, and after holding an expedited hearing on the disputed issues, I find that Petitioner is entitled to compensation for her SIRVA Table injury.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

I.      **Relevant Procedural History**

This case was initiated in January 2021. On July 6, 2023, Respondent filed his Rule 4(c) Report and Motion to Dismiss. ECF No. 36-37. Petitioner was ordered to file a combined Response to Respondent's Rule 4 Report/Motion to Dismiss and Motion for Ruling on the Record addressing whether Petitioner has established that she met the Act's severity requirement pursuant to Section 11(c)(1)(D), and otherwise established a SIRVA Table claim. Petitioner filed her motion and response on October 2, 2023, Respondent filed a brief in reaction on November 15, 2023, and Petitioner filed a reply brief on November 22, 2023. ECF Nos. 39, 41-42.

The parties were subsequently notified that I would resolve this dispute via an expedited hearing, which took place on September 5, 2025. ECF No. 43. After considering the arguments of both sides and questioning the parties in regard to the disputed issues at the expedited hearing on September 5, 2025, I issued an oral ruling finding Petitioner entitled to compensation. This Ruling memorializes those findings/determinations.

II.     **Factual Findings and Ruling on Entitlement**

        A.  **Legal Standards**

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of*

*Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### B. Factual Findings[4]

#### 1. Date of Vaccination

A preliminary issue in this case is whether Petitioner received the flu vaccine on October 23, 2019, as alleged. Respondent correctly points out that the vaccine administration record from CVS pharmacy states that Petitioner was actually vaccinated on October *28*, 2019. Ex. 2 at 3.

However, the medical record corresponding to Petitioner's first medical visit (an emergency department visit) to address her left shoulder pain – which occurred *on October 26, 2019* (and thus two days before the proposed "correct" vaccination date) - specifically states: "*10/23 received influenza vaccine* at her work." Ex. 3 at 22 (emphasis added). Thereafter, on November 7, 2019, Petitioner was seen by orthopedist, Dr. McCarroll.[5] Her intake forms for that visit document that Petitioner responded to the inquiry "List Injury Date or Approximate Date Symptoms Began" with "Wed Oct 23, 2019" and in response to question "Are you being seen as the result of an accident or injury?" Petitioner checked the "Yes" box and handwrote "injury from flu shot." Ex. 26 at 7. In response to "Please tell us how the accident or injury occurred" Petitioner wrote "flu shot at work." *Id.*

Additionally, Petitioner filed a copy of a flu vaccine announcement from her workplace for "Wednesday, October 23rd." Ex. 17. The announcement has the CVS logo on it. *Id.* Petitioner explains in her supplemental sworn declaration that she received a flu shot at on October 23, 2019, administered into her left shoulder by CVS pharmacy at her workplace. Ex. 21. She states that the CVS vaccination record incorrectly provides October 28, 2019, as the date of vaccination. She explains that Exhibit 17 is a correct

---

[4] I have fully reviewed and considered all medical records and the parties' filings and briefing in this matter, however for the purpose of brevity my factual findings do not summarize and/or address all medical records and other evidence, or each argument put forward by the parties.

[5] I observe that Dr. McCarroll's November 7, 2019 record states: "This 38-year-old female came today because she got a flu shot in her left shoulder *about a day or 2 ago* and right after the flu shot that afternoon again became very painful and that got worse she has difficulty sleeping." Ex. 4 at 2 (emphasis added). However, the timing of Petitioner's vaccination described in this statement most likely is in error as it is clearly contradicted by Dr. McCarroll's own intake forms, as well as other evidence that demonstrating Petitioner received her flu vaccination on October 23, 2018 (not a day or two before her November 7, 2019 visit).

copy of the "10/23/2019 Flu Shot Announcement Post" provided to her and her coworkers. *Id.*

Accordingly, I find that more likely than not that Petitioner received a vaccination on October 23, 2019, as alleged.

## 2. Severity

The next issue to be determined in this case is whether Petitioner has satisfied the Vaccine Act's "severity requirement," pursuant to which a petitioner demonstrate that they:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

Section 11(c)(1)(D). To do so here, Petitioner would need to establish sequelae from her alleged SIRVA persisted until at least April 24, 2020 (assuming an onset of October 23, 2019). After a careful review of the record, I find that Petitioner has established that she more likely than not suffered the sequela of her injury for more than six months.

The medical record in this case demonstrates that Petitioner sought immediate care for her left shoulder pain, and aggressively treated her left shoulder injury for the next two months, including: seeking care at the emergency department, receiving prescription medication, undergoing a left shoulder MRI, obtaining an orthopedic evaluation, and participating in eight occupational therapy sessions. Ex. 3 at 22-24, Ex. 4 at 2-3, 28, 32. At her discharge from occupational therapy on December 30, 2019, while Petitioner was noted by her physical therapist to have "full motion," her left shoulder external rotation was found on examination to be "AROM 70˚, with pain," while her right external rotation was found to be "WNL" – or within normal limits.[6] Ex. 4 at 28-30. Petitioner's occupational therapist further observed that Petitioner did "still have some low level pain in her left shoulder, but it is decreasing. She is ready for discharge to a home program and will call if any problems arise." *Id.* at 30. Petitioner was instructed to continue with her "HEP" (home exercise program) follow-up with her doctor as needed, and to call with any questions. *Id.*

---

[6] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 90 to 100 degrees in external rotation, and 70 to 90 degrees in internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016). Petitioner's flexion, abduction, and internal rotation were noted to be within normal limits. Ex. 4 at 28-29.

Respondent correctly points out that following her discharge from physical therapy, Petitioner did not seek or obtain any additional treatment for her shoulder injury, or report continued shoulder symptoms to a provider, for over a year. Additionally, during this gap in her shoulder treatment, Petitioner sought treatment from two other providers – her OB/GYN and an allergy and asthma specialist – and the records from those providers contain no report of any shoulder pain, or other symptoms.

Petitioner explains in her sworn declaration that after her discharge from occupational therapy she performed home exercises on a daily basis, and references her home exercise handout (filed in support of her claim as Exhibit 15). Ex. 21 at 3 (citing Ex. 15). Petitioner states that she saw her OB/GYN on February 28, 2020 for a hemorrhoids related visit, and on June 4, 2020 for her annual gynecological screening exam. *Id.* She explains she did not raise her shoulder concerns at these visits as the appointments were to address her gynecological concerns. *Id*. Petitioner further states she was seen by allergy and asthma specialist on July 8, 2020, due to her allergies and asthma, and did not report her shoulder pain because it was outside that provider's specialty. *Id*. However, Petitioner states she did discuss her left shoulder pain at her next visit to this specialist on November 12, 2020, because she was offered a flu shot. *Id*. Petitioner states she explained that she "developed left shoulder pain following a flu shot in October of 2019. I complained of how my left shoulder still hurts from that flu shot. I declined receiving a flu shot." *Id*. (citing Ex. 7 at 3). The medical record corresponding to Petitioner's November 12, 2020 visit corroborates that she "[d]eferred" a flu shot, but does not document a report of shoulder pain. Ex. 7 at 3.

Petitioner explains that she "continued to perform my home exercises for my left shoulder on a regular basis with hopes that my left shoulder pain would improve with time." Ex. 21 at 4. However, Petitioner states that she continued to experience left shoulder pain and decided to consult with her orthopedist, whom she called in early January of 2021 "due to my ongoing left shoulder pain." *Id*. On January 4, 2021, Petitioner states she received a return call from her orthopedist's office recommending she see a shoulder specialist. *Id*. (citing Exs. 18 – a screenshot of a voicemail message, and Ex. 19 – an audio recording of a message from Dr. McCarroll's office). Petitioner's call to Dr. McCarroll's office is corroborated by audio of the message she received from "Cara" at Dr. McCarroll's office, and a transcript of the audio, stating that "I got your message regarding your shoulder. I spoke to Dr. McCarroll and he feels you would best benefit from seeing one of our shoulder specialists." Exs. 19, 25.

Petitioner further states that "she decided to seek help from a physical therapy and chiropractic clinic" and scheduled an appointment. Ex. 21 at 4. Petitioner's medical records reflect she was seen by chiropractor, Dr. Barkat, on April 29, 2021 –

approximately 16 months after her discharge from physical therapy at the end of 2019. Ex. 16 at 10. Dr. Barkat's record notes Petitioner's "1-2 year history of left shoulder pain where she presented to Methodist Sports Medicine for left shoulder pain after receiving a flu shot." *Id.* Dr. Barkat reviewed Petitioner's "MRI findings [from November 2019] for bursitis and supraspinatus tendon tendinopathy and possible partial tear." *Id.* The notes that Petitioner states that her "left shoulder range of motion has improved over 1.5 years with several months [of] physical therapy and pain medication. She states symptoms are aggravated with left arm range of motion and sleeping on her right side [sic]." *Id.* The record also states that Petitioner reported "fatigue and weakness in left lower arm and achy midthoracic pain associated with left shoulder pain." Ex. 16 at 10. Petitioner and Dr. Barkat also discussed her long history of cervicothoracic pain (which predated her left shoulder injury[7]). *Id.* No physical examination is documented from this visit. Dr. Barkat assessed Petitioner with cervical radicular pain and left shoulder pain. *Id.* at 11. A possible referral to another doctor for an evaluation of a partial tear in Petitioner's left shoulder was discussed, and it was noted that Petitioner "would like to think about treatment." *Id.* at 10.

Petitioner returned to see Dr. Barkat on May 24, 2021 for her "left shoulder pain, history of cervical spine stiffness and intermittent left wrist pinching and tightness." Ex. 16 at 7. She stated that her left shoulder pain interfered with her "sleep quality" and certain activities of daily living "such as getting dressed," and rated "her symptoms between 3 and 4/10." *Id.* A physical exam only notes "[r]ight upper trapezius is moderately hypertonic on palpation" and that her "[l]eft upper trapezius is mildly hypertonic on palpation." *Id.* No additional physical exam findings, such as shoulder range of motion measurements, are provided. Dr. Barkat did however treat Petitioner's left shoulder with "5 minutes of H-Wave muscle stimulation surrounding left shoulder" and "[a]pplied Kinesio tape to [her] left shoulder in stabilization format." *Id.* He also demonstrated the Codman (a shoulder) exercise. *Id.* Petitioner did not receive any further shoulder treatment subsequent to this appointment.

Petitioner has also filed a sworn declaration from her husband, Erik Ruge, dated October 29, 2021, in support of her claim. Ex. 20. Mr. Ruge recounts that

> [s]tarting in about January of 2020, Beth religiously did home exercises which included her shoulder. She followed the regimen[] provided to her by her doctors and/or physical therapists. Beth did exercises in the morning when she got up routinely. If she missed, she would do them at night before bed. I saw this on many occasions throughout the next year.

---

[7] *See* Ex. 9 at 7, 30.

Ex. 20 at 1. Mr. Ruge further recalls that in "April or May of 2021, since her arm never returned to normal," Petitioner stated she was going to see a chiropractor. *Id*. He further recalls that after she was seen by the chiropractor she stated "the chiropractor felt there was very little that could be done except to continue the exercises. Beth has continued to do her home exercises." *Id.* at 1-2.

I find that Petitioner's left shoulder pain related to her October 23, 2019 vaccination likely persisted during the substantial gap in her shoulder treatment between her discharge from occupational therapy on December 30, 2019, until she was seen by Dr. Barkat on April 29, 2021. Petitioner's shoulder injury, as she acknowledges, and as evidenced by the medical records and her ability to forego formal treatment for her pain, was very mild. ECF No. 42 at 5. I deem significant the fact that Petitioner's gap in treatment commenced in the months just prior to the start of the COVID-19 Pandemic and continued throughout its first year. During this time period many individuals sought minimal medical care, and otherwise limited their exposure to the virus. Additionally, the notation in Petitioner's occupation therapy discharge record that she was "ready for a home program" and "instructed" to continue her home exercise program, is consistent with the declaration testimony of Petitioner and her husband that she subsequently engaged in at-home shoulder exercises. Ex. 20 at 1; Ex. 21 at 3. I find that the continued pursuit of a home exercise program was a reasonable choice for someone with a mild shoulder injury during the Pandemic.

I acknowledge that Petitioner did seek *some* treatment from other medical reasons during this time period, but did not report shoulder pain to those providers (although she could have done so). However, the treatment Petitioner sought was minimal, and I accept her testimony that she did not report her shoulder pain to treaters with different medical specialties,[8] even if in the past she had at times reported non-gynecological issues to her OB/GYN (as Respondent asserts).[9] Ex. 21 at 3; ECF No. 41 at 2. I further accept Petitioner's testimony that when her shoulder pain persisted, she eventually reached out to her orthopedist in January 2020, as it is well-supported by the audio (and corresponding transcript) of Petitioner's return voicemail message from her orthopedist's office – even if specific details regarding her shoulder complaints are not contained in the message – it is clear that Petitioner had reaching out regarding her shoulder. Ex. 19; Ex. 23. I also

---

[8] I reject Respondent's argument that because an allergy and asthma provider specializes in immunology it would be expected that she would report shoulder pain to the provider. ECF No. 36 at 11-12. As I explained at the expedited hearing on September 5, 2025, this argument would carry substantially greater weight had Petitioner seen an orthopedic provider during this time.

[9] Petitioner, however, maintains that she did discuss her shoulder injury and continued shoulder pain with her allergy and asthma specialist at one of her two relevant visits, as the provider offered her a vaccination at her November 12, 2020 visit, but which she declined. Ex. 21 at 3. This discussion is not contained within the medical record, although the record does state that Petitioner "deferred" a flu vaccine at this this visit – providing *some* support for Petitioner's assertion. Ex. 7 at 3.

acknowledge that this contact occurred around the same time as Petitioner filed the instant claim, but observe that a large number of cases were filed during this time period as Respondent issued a Notice of Proposed Rulemaking seeking to remove SIRVA and vasovagal syncope from the Vaccine Injury Table. National Vaccine Injury Compensation Program: Revisions to the Vaccine Injury Table, 85 FR 43794, 43794-43800 (July 20, 2020).

Finally, Petitioner's continued sequela of shoulder pain is supported by her April and May 2021 visits with Dr. Barkat. Dr. Barkat's records support that Petitioner complained of continued shoulder pain, which was aggravated by sleeping on her side and left arm range of motion. Ex. 16 at 10. Dr. Barkat also discusses Petitioner's "1-2 year history of left shoulder pain where she presented to Methodist Sports Medicine for left shoulder pain after receiving a flu shot." *Id.* Respondent argues Petitioner's continued shoulder symptoms are not supported by objective evidence of an ongoing shoulder joint injury, such as range of motion or impingement. ECF No. 36 at 11. However, while such evidence might be helpful (if generally consistent with Petitioner's pre-gap shoulder findings) it is not required to demonstrate sequela. (I observe there is no question that Petitioner had previously objectively demonstrated the necessary reduced range of motion findings required under the Table to demonstrate a SIRVA.). Moreover, I observe that Petitioner's symptoms in 2021 of shoulder pain and complaints that her pain was aggravated with range of motion and sleeping, are generally similar to her shoulder complaints following her flu vaccination in 2019.

Accordingly, Petitioner has established that she suffered the sequela of her October 23, 2019 flu vaccination for more than six months. However, Petitioner's very limited treatment course, and substantial gap in treatment, strongly suggests that her injury was is very mild – a factor that I will take into account in any damages determination.

### 3.  Pain limited to Petitioner's left shoulder

The final contested issue is whether Petitioner has demonstrated that her pain was limited to her vaccinated shoulder. 42 C.F.R. § 100.3(c)(10)(iii). Respondent asserts that "the evidence shows, instead, that she presented with occasional "tingling pain into [the] left hand/pinky." ECF No. 36 at 13-14 (citing Ex. 3 at 22). Additionally, I observe that Petitioner reported to Dr. Barkat "fatigue and weakness in left lower arm and achy midthoracic pain associated with [her] left shoulder pain." Ex. 16 at 10.

However, I find that Petitioner's complaints of pain associated with her vaccination were primarily related to her left shoulder. Moreover, I have previously found that claims involving musculoskeletal pain primarily occurring in the shoulder are valid under the Table even if there are additional allegations of pain extending to adjacent parts of the

body, since the essence of the claim is that a vaccine administered to the shoulder primarily caused pain there. *Cross v. Sec'y of Health & Hum. Servs.*, No. 19-1958V, 2023 WL 120783, at *7 (Fed. Cl. Spec. Mstr. Jan. 6, 2023).

### C.  Other Requirements for Entitlement

Petitioner has established all other requirements for a Table SIRVA claim, the remainder of which are not contested herein.[10] 42 C.F.R. § 100.3(c)(10). There is no history of shoulder pain, inflammation, or dysfunction that would explain the post-vaccination injury. 42 C.F.R. § 100.3(c)(10)(i). Petitioner suffered the onset of her injury within 48 hours of her vaccination. 42 C.F.R. § 100.3(c)(10)(ii). And there is not preponderant evidence of another condition that would explain the symptoms. 42 C.F.R. § 100.3(c)(10)(iv). However, even if a petitioner has satisfied the requirements of a Table injury or established causation-in-fact, he or she must also provide preponderant evidence of the additional requirements of Section 11(c), *i.e.,* receipt of a covered vaccine, residual effects of injury lasting six months, etc. *See generally* § 11(c)(1)(A)(B)(D)(E). But those elements are established as discussed herein (severity) or undisputed in this claim. I therefore find that Petitioner is entitled to compensation in this case.

### Conclusion

Based on the entire record, I find that Petitioner has provided preponderant evidence satisfying all requirements for a Table SIRVA. Petitioner is entitled to compensation. Respondent's Motion to Dismiss is denied. A Damages Order will issue.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[10] See ECF No. 36 at 13, n. 8.